# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLAUDIA PALOMARES, § | |
| § | Civil Action No. _____ |
| Plaintiff, § | |
| § | |
| vs. § | |
| § | **COMPLAINT AND JURY DEMAND** |
| BOSTON SCIENTIFIC CORPORATION, § | |
| § | |
| Defendant. § | |
| § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, CLAUDIA PALOMARES, and files this Original Complaint against Defendant Boston Scientific Corporation (hereinafter referred to as "Defendant") as follows:

## NATURE OF CASE

1.      This is an action for damages suffered by CLAUDIA PALOMARES ("Plaintiff"), as a direct and proximate result of Boston Scientific's wrongful conduct in connection with the development, design, manufacture, marketing, distribution and selling of Defendant's Pelvic Mesh Products ("Pelvic Mesh Products" or "Products"). including the Pinnacle Pelvic Floor Repair Kit-Posterior ("Pinnacle") and the Obtryx Mid Urethral Sling System ("Obtryx") inserted in Plaintiff CLAUDIA PALOMARES' body to treat pelvic organ prolapse and stress urinary incontinence, respectively.

## PARTIES

2.      Plaintiff CLAUDIA PALOMARES is a citizen of the State of Texas, county of Tarrant, and the City of Fort Worth.

3.      Defendant Boston Scientific Corporation is a for profit corporation organized and

1

existing under the laws of Delaware with its corporate headquarters in Natick, Massachusetts. Boston Scientific may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE  19808.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendant, Boston Scientific Corporation, are citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      Venue in this action properly lies in this judicial district pursuant to 28 U.S.C. § 1391(a), as this is the judicial district where a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this district. At all times material hereto, Boston Scientific was a for profit corporation authorized to and doing substantial business in this district.

6.      At all times material hereto, Boston Scientific developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold, and otherwise engaged in all activities that are part and parcel of the sale and distribution of the Pelvic Mesh Products at issue in this matter. By said activities, Boston Scientific's Pelvic Mesh Products are placed into the stream of commerce throughout the United States, including within the State of Texas.

7.      Boston Scientific is subject to personal jurisdiction in this district as Boston Scientific systematically and continually conducts business in this district, and Boston Scientific conducts business throughout the United States, including in Texas.

8.      Boston Scientific was founded on June 29, 1979, in Watertown, Massachusetts. Its principal place of business, or World Headquarters, as it is referred to internally, is located at 300 Boston Scientific Way, Marlborough, Massachusetts 01752-1234.  Both Watertown and Marlborough, Massachusetts are within this district.  While the corporation is incorporated in Delaware, the forgoing facts are sufficient to establish the personal jurisdiction of this Court over

Defendant, Boston Scientific.

## FACTUAL ALLEGATIONS:
## BOSTON SCIENTIFIC STRESS URINARY INCONTINENCE PELVIC MESH PRODUCTS BACKGROUND

9.      At all times relevant herein, Defendant Boston Scientific was engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, and selling such Pelvic Mesh Products devices, including the Pinnacle and Obtryx implanted into Plaintiff.

10.     Pelvic Mesh Products are used to treat women with pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). pelvic organ prolapse occurs when a pelvic organ, such as the bladder, drops ("prolapses") from its normal position and pushes against the walls of the vagina. Prolapse can happen if the muscles that hold the pelvic organs in place become weak or stretched from childbirth or surgery. More than one pelvic organ can prolapse at the same time. Organs that can be involved in a pelvic organ prolapse include the bladder, the uterus, the bowel and the rectum. Pinnacle is marketed to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma, and minimal pain while correcting POP.  Stress urinary incontinence is a type of incontinence characterized by leakage of urine during moments of physical stress. Obtryx is marketed to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma, and minimal pain while correcting urinary incontinence.

11.     Pelvic Mesh Products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using Pelvic Mesh Products that were designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of POP and SUI. Manufacturers, including Defendant, began to modify the mesh used in hernia repair for use in the pelvic region to correct POP and/or SUI. Today,

Defendant sells pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The Boston Scientific Pelvic Mesh Products manufactured by Defendant are considered a Class II medical device.

12.     Prior to the implantation of the Pelvic Mesh Product at issue in this claim, Defendant Boston Scientific sought and obtained Food and Drug Administration ("FDA") clearance to market the Pelvic Mesh Product under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted by Boston Scientific with regards to the Pelvic Mesh Products

13.     Instead, Boston Scientific relied on the safety data and information of other *competitors'* Pelvic Mesh Products, assuming that its own Pelvic Mesh Products, would be clinically equivalent. Defendant made this assumption without performing *any* clinical testing prior to marketing the Pelvic Mesh Products.

14.     Defendant knowingly made these representations in violation of federal law. *See* 18 USC §1001. Defendant did not, and has not, adequately studied the extent of the risks associated with the SUI repair Products. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks associated with the Products used to repair SUI.

15.     Defendant knew or should have known that its Pelvic Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks. At the time Defendant began marketing its Pelvic Mesh Products, Defendant was aware that its Pelvic Mesh Products were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011, safety communication.

16.    Defendant's Pelvic Mesh Products, including the Pinnacle and Obtryx implanted in Plaintiff, are made from synthetic, monofilament polypropylene mesh. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in Plaintiff is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with Defendant's Pelvic Mesh Products. This negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. Furthermore, this immune response promotes degradation of the mesh material and contributes to the severe adverse reactions to the Pelvic Mesh Products. When mesh is inserted in the female body, according to the Defendant manufacturer's instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

17.    Defendant Boston Scientific's Pelvic Mesh Products were made from polypropylene resin supplied by Chevron Phillips Chemical Company, LP. Phillips issued revised Material Safety Data Sheets ("MSDS") for the polypropylene resin. Boston Scientific was aware of the MSDS at all relevant times, including when it manufactured and marketed its Pelvic Mesh Devices to the medical community, including Plaintiff's physicians.

18.    The MSDS expressly prohibits use of the material for permanent human implantation:

> "MEDICAL APPLICATION CAUTION: Do not use this Chevron Phillips Chemical Company LP material in medical applications involving permanent implantation in the human body or permanent contact with internal body fluids or tissues.
>
> DO NOT USE this Chevron Phillips Chemical Company LP material in medical applications involving brief or temporary implantation in the human body or contact with internal body fluids or tissues unless the material has been provided directly from Chevron Phillips Chemical Company LP under an agreement which expressly acknowledges the contemplated use.
>
> Chevron Phillips Chemical Company LP makes no representation, promise, express warranty or implied warranty concerning the suitability of this material for

use in implantation in the human body or in contact with internal body fluids or tissues."

19.      Despite this warning, Defendant used the Chevron Phillips resin in its Pelvic Mesh Devices, including the Pinnacle and Obtryx implanted into Plaintiff. Furthermore, Defendant hid this information from the public and physicians, including Plaintiff and her implanting physician.

20.      At the time the Pinnacle and Obtryx were implanted in Plaintiff, it was marketed to the medical community and to patients by Defendant as a safe, effective, and reliable medical device that can be implanted by safe, effective, and minimally invasive surgical techniques.

21.      Defendant Boston Scientific marketed and sold the Pelvic Mesh Products through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing and the provision of valuable cash and noncash benefits to healthcare providers. Defendant Boston Scientific also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety, utility, and efficacy of the Pelvic Mesh Products.

22.      Defendant touted the alleged benefits of the Pelvic Mesh Products and component parts over alternative and competing devices and procedures without any clinical support for such claims or evidence that these alleged benefits led to any improvement or difference in patient outcomes.

23.      Contrary to the representations and marketing of Defendant their Pelvic Mesh Products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating revision surgeries, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff. The defects stem from many issues, including:

    a.      the use of polypropylene material in the Pelvic Mesh Products and the immune reaction that results;

    b.      the design of the Pelvic Mesh Products to be inserted transvaginally into an area of the body with high levels of pathogens that adhere to the mesh, which can cause

immune reactions and subsequent tissue breakdown;

c.     the contraction and/or shrinkage of the mesh and surrounding scar tissue;

d.     biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade and the device to migrate into organs and surrounding structures;

e.     the use and design of anchors in the Pelvic Mesh Products that when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

f.     degradation of the mesh itself over time which causes the internal tissue to degrade;

g.     the welding of the mesh itself during production, which creates a toxic substance that contributes to the degradation of the mesh and host tissue; and

h.     the design of the trocars (devices used to insert the Pelvic Mesh Products into the vagina) requires tissue penetration in nerve-rich environments, which frequently results in the destruction of nerve endings.

24.     Defendant has consistently underreported and withheld information about the propensity of its Pelvic Mesh Products to fail and to cause injury and complications and has misrepresented the efficacy and safety of its transvaginal mesh Pelvic Mesh Products, through various means and media, actively and intentionally misleading the public.

25.     Despite the chronic underreporting of adverse events associated with the Pelvic Mesh Products, enough complaints were recorded for the Food and Drug Administration ("FDA") to issue a public health notification regarding the dangers of these devices.

26.     Between approximately 2005 and 2007, the Food and Drug Administration (FDA), received reports of over 1,000 complaints (otherwise known as "adverse events") associated with transvaginally placed mesh devices.

27.     Between approximately 2008 and 2010, the FDA received over 2,800 reports of adverse events involving individuals who had transvaginally placed mesh devices. The reported complications from these devices included, but were not limited to, mesh erosion through the vagina, pain, infection, bleeding, dyspareunia, organ perforation and urinary problems. Many of these complications required additional extensive surgical intervention and treatment.

28.      Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that Defendant Boston Scientific is one of the manufacturers of the Pelvic Mesh Products that are the subject of the notification.

29.      On July 13, 2011, the FDA issued a Safety Communication entitled, "UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of pelvic organ prolapse was an area of "**continuing serious concern**." (emphasis added) The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of pelvic organ prolapse were "not rare."  Obtryx is made using the same polypropylene mesh used in products designed for POP repair.

30.      The FDA Safety Communication also stated that these serious complications include, but are not limited to, neuromuscular problems, vaginal scarring/shrinkage, and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization. The FDA concluded that it was not clear that transvaginal repair of pelvic organ prolapse and stress urinary incontinence with mesh kits was more effective than traditional non-mesh repair of these conditions. The FDA conducted a systematic review of the published scientific literature from 1996 to 2011 and concluded that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non mesh repair." In the July 13, 2011 Safety Communication, the FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development new complications. Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible." The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13, 2011, was known

or knowable to Defendants and was not disclosed in any manner to Plaintiff or her implanting physician.  Obtryx is made using the same polypropylene mesh used in products designed for POP repair.

31.     Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the White Paper). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh." Obtryx is made using the same polypropylene mesh used in products designed for POP repair.

32.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." Obtryx is made using the same polypropylene mesh used in products designed for POP repair.

33.     The FDA White Paper further stated that "these Pelvic Mesh Products are associated with serious adverse events . . . compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

34.     In its White Paper, the FDA advises doctors to, inter alia, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications." The FDA concludes its White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."  Obtryx is made using the same polypropylene mesh used in products designed for POP repair.

35.     As is known to the Defendant, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issued to manufacturers of Pelvic Mesh Products used to treat SUI in January of 2012.

36.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists (ACOG) and the American Urogynecologic Society (AUGS) also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh. Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

37.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."  Obtryx is made using the same polypropylene mesh used in products designed for POP repair.

38.     In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with mesh "indicates that serious complications can occur. . . [and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh Pelvic Mesh Products used for SUI."

39.     Defendant did not, and has not, adequately studied the extent of the risks associated with Pelvic Mesh Products. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

40.      The Plaintiff's injuries, as will be more fully established in Discovery, are consistent with those reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

41.      Defendant knew or should have known about the risks and complications associated with Pelvic Mesh Products, because they are identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

42.      Defendant Boston Scientific has further known the following:

a.      that some of the predicate devices for the Pelvic Mesh Products had high failure and complication rates, resulting in the recall of some of these predicate devices;

b.      that there were and are significant differences between the Pelvic Mesh Products and some or all of the predicate devices, rendering them unsuitable for designation as predicate devices;

c.      that these significant differences render the disclosures to the FDA incomplete and misleading; and

d.      that its Pelvic Mesh Products were and are causing numerous patients severe injuries and complications.

43.      Defendant knew or should have known that Pelvic Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

44.      In fact, On February 24, 2016, Defendant Boston Scientific issued an "Urgent Recall for Product Correction" [1], which made significant changes to the Directions for Use for its Pelvic Mesh Products. The recall added "[w]arnings, precautions and adverse events" as well as indicating a new restriction that the Pelvic Mesh Products was restricted to use or sale to physicians "trained in the use of surgical mesh for repair of surgical incontinence." The recall further added these new and previously undisclosed warnings:

a.      "The use of polypropylene mesh in urogynecologic procedures such as the treatment

---

[1]

https://www.hsa.gov.sg/content/dam/HSA/HPRG/Medical_Devices/Updates_and_Safety_reporting/Field_Safety_Corrective_Action/FSN/2016/February/HSA%206004101-007-16-01_41%20FSN.pdf

of stress urinary incontinence, regardless of the route of delivery (transvaginal, suprapubic or transobturator), has been associated with cases of erosion. Erosion has been reported in bladder, vagina, urethra, ureter, and bowel. Treatment of the erosion may require surgical removal;

b.  "As with all surgical procedures, certain risk factors are known to impact patient outcomes in the pelvic floor which include, but are not limited to, impaired vascularity (e.g. diabetes, smoking status, estrogen status, pelvic floor radiation exposure, etc.), age, pelvic floor myalgia, impaired wound healing (e.g. diabetes, steroid usage, etc.), or active infection in or near the surgical site. The above pathophysiologic conditions must be considered when determining whether the patient is an appropriate candidate for mesh implantation, either by Transvaginal, suprapubic or transobturator route;

c.  "Mesh is considered a permanent implant. Removal of mesh or correction of mesh-related complication may involve multiple surgeries:

d.  "Complete removal of mesh may not be possible and additional surgeries may not always fully correct the complications.

e.  "Tissue responses to the mesh implant could include scarring/scar contracture;

f.  "[k]nown risks of surgical procedures for the treatment of incontinence include: [o]ngoing pain"

(Urgent Recall for Product Correction, attached hereto as **Exhibit A**).

45.     These new additional warnings and instructions were not included in the warnings provided to Plaintiff's physician prior to her being implanted with the Pelvic Mesh Products.

46.     The scientific evidence shows that the material from which Pelvic Mesh Products are made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with Pelvic Mesh Products, including Plaintiff.

47.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

48.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or

appearance in the materials that are used in device construction." Pelvic Mesh Products were unreasonably susceptible to degradation and fragmentation inside the body.

49.     Pelvic Mesh Products were unreasonably susceptible to shrinkage and contraction inside the body. Defendant should have known of this serious risk and warned physicians and patients. Pelvic Mesh Products were unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

50.     To this day, Pelvic Mesh Products have been and continue to be marketed to the medical community and to patients as a safe, effective, reliable, medical device, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments for pelvic organ prolapse and stress urinary incontinence.

51.     A woman who elects to have her SUI surgically treated has several options. SUI can be corrected through traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI can also be surgically addressed using synthetic materials placed under the urethra to provide support.

52.     Defendant omitted and downplayed the risks, dangers, defects, and disadvantages of Pelvic Mesh Products, and advertised, promoted, marketed, sold and distributed Pelvic Mesh Products as a safe medical device when Defendant knew or should have known that Pelvic Mesh Products were not safe for its intended purposes, and that Pelvic Mesh Products would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries. Further, while some of the problems associated with Pelvic Mesh Products were made known to physicians, the magnitude and frequency of these problems were not disclosed and were hidden from physicians.

53.     Contrary to Defendant's representations and marketing to the medical community and to the patients themselves, Pelvic Mesh Products had high rates of failure, injury, and complications, fails to perform as intended, requires frequent and often debilitating re-operations, and

has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law.

54.     The specific nature of Pelvic Mesh Products' defects includes, but is not limited to, the following:

   a.   The use of polypropylene in Pelvic Mesh Products and the immune reactions that result from such material, causing adverse reactions and injuries;

   b.   The design of Pelvic Mesh Products to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

   c.   Biomechanical issues with the design of Pelvic Mesh Products, including, but not limited to, the propensity of Pelvic Mesh Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

   d.   The use and design of arms and anchors in Pelvic Mesh Products, which, when placed in women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

   e.   The propensity of Pelvic Mesh Products for degradation, fragmentation aid/or migration;

   f.   The inelasticity of Pelvic Mesh Products, causing them to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

   g.   The propensity of Pelvic Mesh Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time; and

   h.   The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

55.     Pelvic Mesh Products are also defective due to Defendant's failure to adequately warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

   a.   Pelvic Mesh Products' propensity to contract, retract, and/or shrink inside the body;

   b.   Pelvic Mesh Products' propensity for degradation, fragmentation and/or creep;

   c.   Pelvic Mesh Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.      The frequency and manner of mesh erosion or extrusion;

e.      The risk of chronic inflammation resulting from Pelvic Mesh Products;

f.      The risk of chronic infections resulting from Pelvic Mesh Products;

g.      The risk of permanent vaginal or pelvic scarring as a result of Pelvic Mesh Products;

h.      The risk of recurrent, intractable pelvic pain and other pain resulting from Pelvic Mesh Products;

i.      The need for corrective or revision surgery to adjust or remove Pelvic Mesh Products;

j.      The severity of complications that could arise as a result of implantation of Pelvic Mesh Products;

k.      The hazards associated with Pelvic Mesh Products;

l.      Pelvic Mesh Products' defects described herein;

m.      Treatment of stress urinary incontinence with Pelvic Mesh Products is no more effective than feasible available alternatives;

n.      Treatment of stress urinary incontinence with Pelvic Mesh Products exposes patients to greater risk than feasible available alternatives;

o.      Treatment of stress urinary incontinence with Pelvic Mesh Products makes future surgical repair more difficult than feasible available alternatives;

p.      Use of Pelvic Mesh Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.      Removal of Pelvic Mesh Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and complete removal of Pelvic Mesh Products may not be possible and may not result in complete resolution of the complications, including pain.

56.      Defendant Boston Scientific suppressed this information and failed to accurately and completely disseminate or share this and other critical information with others, including Plaintiff. As a result, Defendant Boston Scientific actively and intentionally misled and continues to mislead the public into believing that its Pelvic Mesh Products and the procedures for implantation were and are safe and effective.

57.      Defendant Boston Scientific failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to Pelvic Mesh Products.

58.     Defendant Boston Scientific failed to design and establish a safe, effective procedure for removal of the Pelvic Mesh Products.  Thus, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Pelvic Mesh Products or parts thereof.

59.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for repair of stress urinary incontinence have existed at all times relevant to this matter. These included native tissue repairs and other synthetic sling devices that have been: 1) clinically studied; 2) shown to be safer and/or more effective than the Pelvic Mesh Products; and/or 3) did not present the same frequency or severity of risks as does Pelvic Mesh Products.

60.     The Pelvic Mesh Products were at all times utilized and implanted in a manner foreseeable to Defendant Boston Scientific, as they generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

61.     Defendant Boston Scientific provided incomplete, insufficient, and misleading training and information to physicians regarding the use of the Pelvic Mesh Products and aftercare of patients implanted with the Pelvic Mesh Products.

62.     The Obtryx implanted into Plaintiff was in the same or substantially similar condition as when it left the possession of Defendant Boston Scientific, as well as being in the condition directed by and expected by this Defendant.

63.     Plaintiff and her physicians foreseeably used and implanted the Obtryx Sling System and did not misuse or alter the Obtryx Sling System in an unforeseeable manner.

64.     The injuries, conditions, and complications suffered by women who have been implanted with the Pelvic Mesh Products include, but are not limited to, mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, acute and chronic nerve damage and pain, pudendal nerve damage,

pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, recurrent and chronic infections, and prolapse of organs.

65.     In many cases, including Plaintiff's, these women have been forced to undergo intensive medical treatment, including, but not limited to, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and surgeries to remove portions of the female genitalia, to locate and remove mesh, and to attempt to repair pelvic organs, tissue, and nerve damage.

66.     The medical and scientific literature studying the effects of polypropylene pelvic mesh (like the Pelvic Mesh Products) have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself and do not often suggest errors related to the implantation of the devices.

67.     Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions and results in significant scarring on fragile compromised pelvic tissue and muscles.

68.     Defendant Boston Scientific knew and had reason to know that the Pelvic Mesh Products could and would cause severe and grievous personal injury to the users/recipients of the Pelvic Mesh Products, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

69.     At all relevant times herein, Defendant Boston Scientific continued to market Pelvic Mesh Products as safe and effective even when no clinical trials had been done supporting long or short-term efficacy. In doing so, Defendant failed to disclose the known risks and failed to warn of known or scientifically knowable dangers and risks associated with Pelvic Mesh Products, including the magnitude and frequency of these risks.

70.     At all relevant times herein, Defendant Boston Scientific failed to provide sufficient warnings and instructions that would have put Plaintiff and the public on notice of the dangers and adverse effects caused by implantation of the Pelvic Mesh Products.

71.     The Pelvic Mesh Products, as designed, manufactured, distributed, sold and/or supplied by Defendant, were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

## CASE-SPECIFIC ALLEGATIONS

72.     On or about September 23, at JPS Hospital, located in Ft. Worth, Texas, Plaintiff's physician, Jacqueline Garda, DO, implanted the Boston Scientific Obtryx Sling System ("Device"), Lot No. ML00001654 – Reference No. M0068505000, which is the Pelvic Mesh Product aforementioned, through general anesthesia surgery, to treat stress urinary incontinence.

73.     Plaintiff's treating physician implanted the Device properly and appropriately and in accordance with the Directions for Use generated and provided by Defendant.

74.     At all times material hereto, Defendant failed to comply or properly comply with state and Federal law in connection with the Device. The risk of serious injuries was known or should have been known to Defendant, but in spite of these risks, Defendant continued to market the Device to physicians and patients, including Plaintiff, without adequate warnings.

75.     Had Defendant properly disclosed the risks associated with the Device, Plaintiff would not have agreed to undergo the implantation of the Device.

76.     As a result of the implantation of the Device, Plaintiff began experiencing pain, infections, vaginal scarring/shrinkage, and urinary problems sometime after implant.

77.     Plaintiff returned to her physicians several times due to complications and problems attributed to the Device. On November 25, 2019, Plaintiff underwent revision/mesh removal surgery performed by Jose Gerardo Garza Leal, MD, at Universidad Autonoma de Nuevo Leon. Facultad de

Medicina y Hospital Universitario in Monterrey, Nuevo Leon, Mexico. Dr. Garza Leal found that there was extrusion of mesh material, and that Plaintiff was suffering from continued incontinence. Dr. Garza Leal was able to encounter the tips of the sling and was able to completely remove it without complication.

78.      As a direct and proximate result of the use of the Obtryx, Plaintiff suffered, and continues to suffer, serious physical bodily injury and harm, and mental pain and suffering.

79.      Plaintiff, in the exercise of due diligence, could not reasonably have discovered the cause of her injuries, including, but not limited to, the defective design and/or manufacturing of the Obtryx until recently.

80.      As a direct and proximate result of the use of the Obtryx, Plaintiff incurred, and continues to incur, medical expenses to treat her injuries and condition.

81.      As a direct and proximate result of the use of the Obtryx, Plaintiff continues to receive medical treatment and is anticipated to undergo further medical treatment.

## COUNT I
## STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

82.      Plaintiff hereby incorporates by reference and reavers each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and further states and alleges as follows:

83.      Prior to, on, and after the date the Device was implanted in Plaintiff and at all relevant times, Defendant designed, distributed, manufactured, sold, and marketed the Device for use in the United States.

84.      At all times herein mentioned, Defendant designed, distributed, manufactured, marketed, and sold the Device such that it was dangerous, unsafe, and defective due to design, manufacture, and lack of adequate warnings.

85.     The Device contained all of these defects when it left Defendant's possession.

86.     The Device reached Plaintiff without substantial change in the condition in which it was sold.

87.     The Device had potential risks and side effects that were known or knowable to Defendant through scientific knowledge available before, at, and after the manufacture, distribution, and sale of the Device.

88.     Defendant knew or should have known of the defective condition, characteristics, and risks associated with the Device, as previously set forth herein.

89.     The Device implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein with respect to its design. Said design defects include, but are not limited to:

    a.    The use of polypropylene material in the Device and the immune reaction that results from such material, causing adverse reactions and injuries;

    b.    The design of the Device to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    c.    Biomechanical issues with the design of the Device, including, but not limited to, the propensity of the Device to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

    d.    The use and design of arms and anchors in the Device which, when placed in the woman, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

    e.    The propensity of the Device for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

    f.    The hyper-inflammatory responses to the polypropylene Device leading to problems including chronic pain and fibrotic reaction;

    g.    The propensity of the polypropylene Device to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

    h.    The adverse tissue reactions caused by polypropylene Device, which are causally related to infection, as polypropylene is a foreign organic material from animals and/or human cadavers;

     i.     The harshness of the polypropylene Device upon the female pelvic tissue, and the hardening of the Device in the body;

     j.     The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the Device is implanted according to the manufacturers' instructions, and

     k.     The use of polypropylene material in the products and the failure to provide adequate directions for use and training.

90.     Plaintiff suffered from pelvic pain, bilateral hydrosalpinx and pelvic adhesive disease all caused by the Obtryx sold by Defendant.

91.     As a direct and proximate result of the Device design defects as described herein above, Plaintiff has been catastrophically injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, humiliation, disfigurement, loss of care, comfort, and economic damages.

92.     Thus, Defendant is strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling the defective Device.

**COUNT II**
**STRICT LIABILITY - MANUFACTURING DEFECT**

93.     Plaintiff hereby incorporates by reference and reavers each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and further states and alleges as follows:

94.     The Device implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein as a matter of law with respect to its manufacture, in that it deviated materially from Defendant's design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff.

95.     The Device ultimately contained material which was not appropriate for "medical applications involving permanent implantation in the human body or permanent contact with internal

body fluids or tissues" per the MSDS contained on the polypropylene resin used to manufacture the Device.

96.      Furthermore, the "de-tanging" of the mesh via heat in fact caused the Device to deviate from Defendant's specifications, causing the mesh to be twice as stiff as other mesh products on the market, leading to an increase in the rates of erosion into the bladder and urethral injuries suffered by Plaintiff.

97.      Defendant is strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling defective products.

98.      As a direct and proximate result of the Device's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and/or corrective surgery and hospitalization, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

99.      Because of these manufacturing defects, the Device and its polypropylene mesh component that was implanted in Plaintiff was unreasonably dangerous, not reasonably safe for its intended use, and was defective as a matter of law with respect to their manufacture.

100.     The defective and unreasonably dangerous condition of the Device and its polypropylene mesh component was a proximate cause of the damages and injuries to Plaintiff.

101.     Thus, Defendant Boston Scientific is strictly liable to Plaintiff.

## COUNT III
## STRICT LIABILITY - FAILURE TO WARN

102.     Plaintiff hereby incorporates by reference and reavers each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and further states and alleges as follows:

103.     Prior to, on, and after the date the Device was implanted in Plaintiff, and at all

relevant times, Defendant designed, tested, distributed, manufactured, advertised, sold, and marketed the Device for use by consumers, such as Plaintiff, in the United States.

104.    Prior to, on, and after the date the Device was implanted in Plaintiff, Defendant had a duty to exercise due care and avoid unreasonable risk of harm in and about their design, developing, assembling, licensing, labeling, testing, distributing, manufacturing, supplying, ordering, advertising, selling, and marketing of the transvaginal mesh device implanted into the Plaintiff, including the duty to assure that the product did not pose a significantly increased risk of bodily harm and adverse events.

105.    The Device implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendant did not provide sufficient or adequate warnings to Plaintiff's treating physicians regarding, among other subjects:

    a.    The Device's propensity to contract, retract, and/or shrink inside the body;

    b.    The Device's propensity for degradation, fragmentation, and disintegration;

    c.    The rate and manner of mesh erosion or extrusion;

    d.    The risk of chronic inflammation resulting from the Device;

    e.    The risk of chronic infections resulting from the Device;

    f.    The risk of permanent vaginal or pelvic scarring as a result of the Device;

    g.    The risk of recurrent, intractable, permanent pelvic pain and other pain resulting from the Device;

    h.    The need for corrective or revision surgery to adjust or remove the Device;

    i.    The severity of complications that could arise as a result of implantation of the Device;

    j.    The hazards associated with the Device;

    k.    The Device's defects described herein;

    l.    Treatment of stress urinary incontinence with the Device is no more effective than feasible available alternatives;

    m.    Treatment of stress urinary incontinence with the Device exposes patients to greater risk than feasible available alternatives;

    n.    Treatment of stress urinary incontinence with the Device makes future surgical

repair more difficult than feasible available alternatives;

o.   Use of the Device puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

p.   Removal of the Device due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

q.   Complete removal of the Device may not be possible and may not result in complete resolution of the complications, including pain; and

r.   The nature, magnitude and frequency of complications that could arise as a result of implantation of the Device.

106.   As a direct and proximate result of the defects described herein, Plaintiff has been catastrophically injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, humiliation, disfigurement, loss of care, comfort, and economic damages.

## COUNT IV
## NEGLIGENCE

107.   Plaintiff hereby incorporates by reference and reavers each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein and further states and alleges as follows:

108.   Prior to, on, and after the date of Plaintiff's implantation with the Device, and at all relevant times, Defendant designed, distributed, manufactured, sold, and marketed the Device for use by consumers such as Plaintiff in the United States.

109.   Prior to, on, and after the date of Plaintiff's implantation with the Device, and at all relevant times, Defendant knew or reasonably should have known that the Device and its warnings were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner.

110.   Prior to, on, and after the date of Plaintiff's implantation with the Device, and at all relevant times, Defendant became aware that the defects of the Device resulted in the Device causing injuries similar to those Plaintiff suffered.

111.   Prior to and on the date of Plaintiff's implantation with the Device, Defendant breached its duty of care owed to Plaintiff and her physicians by its actions and inactions, including

but not limited to the following:

    a.    Designing and distributing a product in which it knew or should have known that the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

    b.    Designing and distributing a product in which it knew or should have known that the likelihood and severity of potential harm from the product exceeded the likelihood of potential harm from other devices available for the same purpose;

    c.    Failing to use reasonable care to warn Plaintiff's treating physicians about the Device's substantially dangerous condition or about facts making the product likely to be dangerous;

    d.    Negligently recruiting and training physicians and surgeons to implant its Pelvic Mesh Products and without adequately providing information about the severity frequency and permanency of the risks to those physicians and surgeons;

    e.    Failing to perform reasonable pre- and post-market testing of the Device to determine whether or not the product was safe for its intended use;

    f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would prescribe, use, and implant the Device;

    g.    Advertising, marketing, and recommending the use of the Device, while concealing and failing to disclose or to warn of the dangers known by Defendant to be connected with and inherent in the use of the Device;

    h.    Representing that the Device was safe for its intended use when, in fact, Defendant knew or should have known the product was not safe for its intended purpose;

    i.    Continuing manufacture and sale of the Device with the knowledge that said product was dangerous and not reasonably safe, and failing to comply with FDA good manufacturing regulations and policy;

    j.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Device so as to avoid the risk of serious harm associated with the use of the Device; and

    k.    Failing to perform adequate evaluation and testing of the Device where such evaluation and testing would have revealed the propensity of the Device to cause injuries as described herein.

    112.    As a direct and proximate result of Defendant's negligence, as set forth herein, Plaintiff has been catastrophically injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, humiliation, disfigurement, loss of care, comfort, and economic damages.

113.        In taking the above acts and omissions, Defendant acted with gross negligence. Defendant's conduct was malicious, willful, wanton, reckless, and showed conscious disregard for the lives and safety of others. Defendant's gross negligence and/or malicious, willful, reckless, and wanton misconduct justifies an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendant Boston Scientific, as follows:

a.    Compensatory damages, in excess of the amount required for federal diversity jurisdiction, and in an amount to totally compensate Plaintiff for all of their injuries and damages, both past, present and future;

b.    Special damages, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiff for all of her injuries and damages, both past and present, including but not limited to, past and future medical expenses, lost income, loss of earning capacity, permanent disability, and pain and suffering;

c.    Restitution and disgorgement of profits;

d.    Punitive damages;

e.    Attorneys' fees, expenses, and costs of this suit;

f.    Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

g.    Such other relief, monetary or equitable, as this Court deems necessary, just and proper.

## JURY DEMAND

Plaintiff specifically demands a trial by jury of all claims asserted in this Complaint.


Dated: <u>November  17th  2021</u>

Respectfully submitted,

*/s/ Julie Ferraro*
Julie Ferraro
MA Bar No: 665364
KETTERER, BROWNE &
ANDERSON, LLC
336 S. Main Street
Bel Air, MD 21014
Tel: 855-522-5297
Fax: 855-572-4637
julie@kbaattorneys.com


To be moved in pro hac vice:

*/s/ Danae N. Benton*
Danae N. Benton
TX State Bar No: 24080422
FEARS NACHAWATI LAW FIRM
5473 Blair Road
Dallas, TX 75231
Tel. 214-890-0711
Fax. 214-890-0712
dbenton@fnlawfirm.com


**ATTORNEYS FOR THE PLAINTIFF**